# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOHN C. CRAFT, Special Deputy Liquidator
of Meadowlark Insurance Company,

        Plaintiff,

vs.                                      CIV. No.  98-0966 BB/DJS

SUNWEST BANK OF ALBUQUERQUE, N.A.,
n/k/a NATIONSBANK, N.A., Successor to
Sunwest Bank of Albuquerque, N.A., and DOES
1 through 50, inclusive,

        Defendants.

## OPINION AND ORDER

      THIS MATTER comes before the Court for consideration of a number of motions filed by the parties.  These motions include Defendant's motion to dismiss on statute-of-limitations grounds (Doc. 25); Defendant's motion to dismiss for lack of standing (Doc. 32); Defendant's motion for partial summary adjudication dismissing the breach-of-trust claim (Doc. 39); Defendant's motion for partial summary adjudication dismissing the gross-negligence claim (Doc. 79); Defendant's motion for partial summary adjudication eliminating punitive damages as an issue in the case (Doc. 70); Defendant's motion for partial summary judgment eliminating attorney's fees as a possible award to Plaintiff (Doc. 75); and Plaintiff's motion for summary judgment on the merits and requesting a certain amount of damages as a matter of law (Doc. 44).

### Facts

      Meadowlark Insurance Company was an offshore insurer desiring to sell surplus lines of insurance in the United States.  Toward that end, Meadowlark's management contacted Sunwest Bank ("Defendant") to set up a trust fund.  This trust fund was necessary to allow Meadowlark to

legally sell insurance in many states, including New Mexico. The purpose of the fund was to provide security and a means of paying off claims against Meadowlark, should the company not survive financially. The existence of the trust fund gave state regulators some assurance that Meadowlark would not simply sell insurance policies, pocket the proceeds, and move back offshore without paying the claims that might result from the sale of the policies.

To ensure that sufficient assets would be available to satisfy potential claims against Meadowlark, the terms of the written trust agreement stated that a minimum of $1,500,000 would be maintained in the trust at all times. This minimum asset level had to consist of three, and only three, types of assets: (1) cash in U.S. currency; (2) letters of credit; or (3) readily marketable securities. The agreement recited that Meadowlark had already transferred a minimum of $1,500,000 in qualifying assets to the trust.

In fact, at the time the trust agreement was signed, Meadowlark had transferred no assets to Defendant. Subsequently, when Meadowlark did transfer some assets, they were mainly assets not meeting the requirements of cash, letters of credit, or readily marketable securities contained in the trust agreement. Instead, the assets consisted of mortgages and other interests in real estate, which ostensibly had a total value of approximately $2,500,000. Despite the fact that these assets did not conform to the requirements of the trust agreement, Defendant accepted them into the trust. Defendant did not insist that qualifying assets be provided, or reject the nonconforming assets proffered by Meadowlark.

Unfortunately for Defendant and for Meadowlark's policyholders, the principal players behind Meadowlark were involved in a moneymaking scheme rather than in operating a genuine insurance company. Meadowlark was never granted permission to operate in New Mexico. In addition, several of its principals were convicted on racketeering charges and sentenced to prison terms. Also, a Missouri court ordered Meadowlark into liquidation proceedings and appointed

Plaintiff special deputy liquidator, on behalf of the Missouri insurance commissioner. In the meantime, Defendant had gone to court in New Mexico to prevent Meadowlark's principals from gaining control over the assets in the trust, and to allow the state court to determine whether those assets should be paid to claimants who had obtained judgments against Meadowlark. When Plaintiff discovered the existence of the trust fund in New Mexico, he moved to participate in the state-court proceedings. Defendant agreed that the assets of the trust should be turned over to Plaintiff, and the state-court proceedings ended.

After Plaintiff gained control of the trust assets, he began investigating the value of those assets. Plaintiff decided the assets, rather than being worth $2,500,000 as claimed, were worth much less. He began a process of finding buyers for the various assets. At this point, most if not all of the assets in the trust have been sold. After subtracting expenses, Plaintiff claims the actual worth of the assets is approximately $206,000. Plaintiff has sued Defendant for the difference between this amount and the $1,500,000 that, according to Plaintiff, would have been in the trust fund if Defendant had not breached the trust agreement. Plaintiff has raised a breach-of-trust claim and a gross negligence claim, and has agreed to dismiss a fraud claim that was originally pled.

## Standard of Review for Motions for Summary Judgment and for Partial Summary Adjudication

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." Id. On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side

or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). Furthermore, motions for partial summary adjudication are governed by the same standards as motions for summary judgment.[1] *See Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1118 (5th Cir.1992) (applying usual summary judgment standard to grant of partial summary judgment). The Court will consider Defendant's motions and Plaintiff's motion in light of these standards.

**Motion for Summary Judgment – Standing**

Defendant maintains Plaintiff has no standing to bring a breach-of-trust or negligence action in this case. According to Defendant, Plaintiff stands in the shoes of Meadowlark, and can pursue only those claims belonging to the company. Also according to Defendant, the breach-of-trust and negligence claims belong to policyholders or claimants who have judgments against policyholders, because these are the individuals who were the beneficiaries of the trust set up by Meadowlark. Under this view of the case, Plaintiff, the statutory liquidator or receiver of Meadowlark, has authority only to collect actual, current assets belonging to Meadowlark and distribute them to the various claimants. Plaintiff may not, however, bring an action that actually belongs to individual claimants, simply because the action might ultimately benefit Meadowlark's estate. Defendant argues this position both as a matter of trust/receiver law, and as a statutory argument based on the Missouri and New Mexico insurance-company-liquidation statutes.

---

[1]The Court notes Defendant has not denominated its motions for partial relief as motions for partial summary adjudication, but terms them motions for summary judgment. Since the motions request only partial relief, however, they are more properly treated as partial adjudications.

4

This same argument has been raised in a number of cases involving insolvent insurers, claims against third parties, and liquidators or receivers of the insurers. In the vast majority of modern cases, the liquidator or receiver has been found to have standing to bring the claim, although the reasoning of the cases has differed. In *Four Star Ins. Agency, Inc. v. Hawaiian Elec. Industries, Inc.*, 974 P.2d 1017, 1024-25 (Hawai'i 1999), for example, the court held that a liquidator not only has standing to pursue such claims, but has exclusive standing to do so. This result was based on a statutory provision granting the liquidator power to prosecute actions on behalf of creditors, and on public policy grounds. The court reasoned that the purposes of the Hawai'i insurance liquidation statutes include ensuring equitable treatment of all creditors and the avoidance of preferences to one claimant or another. Granting exclusive standing to the liquidator to pursue actions belonging to creditors as a whole, or to the company, serves those purposes. Such exclusive standing allows the liquidator to marshall all available assets that may then be distributed evenly among the defunct insurance company's creditors.

Similarly, in *Corcoran v. Frank B. Hall & Co., Inc.*, 545 N.Y.S.2d 278, 281-83 (1989), the court held that the Superintendent of Insurance had exclusive standing to assert general creditor claims possessed by all of the insurance company's creditors and policyholders. The court reached this result despite the lack of language granting the Superintendent power to prosecute actions on behalf of creditors. The court relied on the same public-policy and statutory-purpose grounds as those discussed in *Four Star*. *See also Cordial v. Ernst & Young*, 483 S.E.2d 248, 256-57 (W.Va. 1996) (applying statutory language quite similar to New Mexico's insurance-liquidation statute and holding that a special deputy receiver had standing to bring claims against accounting firm, on behalf of defunct insurer as well as insurer's policyholders, creditors, and the public); *Bonhiver v. Graff*, 248 N.W.2d 291, 296-97 (Minn. 1976) (holding, with no discussion, that receiver represents rights of creditors and therefore may

bring an action against accountants despite the fact the damage was done by the fraud of the insurer's own officers); *cf. Merin v. Yegen Holdings Corp.*, 573 A.2d 928, 933-37 (N.J.Super. 1990)(liquidator may prosecute claim on behalf of creditors and policyholders, if it is claim not personal to those entities; however, class-action notice procedures must be followed).

In a few cases, courts have determined that causes of action such as breach of fiduciary duty by an officer of the insurance company belong to the company rather than policyholders. These courts have therefore decided the receiver or liquidator had standing to prosecute the causes of action whether or not the action could have been brought on behalf of policyholders or other creditors. *See, e.g., Long v. ILA Corp.*, 513 S.E.2d 812, 816-17 (N.C.App. 1999); *Foster v. Peat Marwick Main & Co.*, 587 A.2d 382, 385 (Pa.Cmwlth. 1991).

The Court will follow the case law cited above and hold that Plaintiff, as the special deputy receiver or liquidator of Meadowlark, has standing to bring the breach-of-trust and negligence claims raised in this case. It is apparent that these claims, if successful, will benefit the estate of Meadowlark as a whole rather than any individual claimant. The claims are not designed to redress any individual injury suffered by a policyholder or creditor. Instead, they are intended to increase the assets available for division during the liquidation process. As a matter of public policy in general, and of statutory interpretation in particular, an insurance-company receiver or liquidator has standing to bring such claims. *See Four Star; Corcoran; Cordial.* Furthermore, the language of the trust agreement in this case appears to preclude any beneficiary of the trust from bringing the types of claims Plaintiff seeks to raise. This makes it more imperative that Plaintiff, as the representative of the public and of the claimants as a group, be afforded standing to raise the claims.

The Court also notes that the claims raised by Plaintiff in this case actually belong, at least in part, to Meadowlark. Even if Plaintiff does step into Meadowlark's shoes, as Defendant

contends, Plaintiff would have standing to raise the claims. Meadowlark's position with respect to the trust is that of settlor. The trust was not an irrevocable trust, but only remained irrevocable for five years, after which the assets could revert to Meadowlark upon the occurrence of certain conditions. In addition, one purpose of the trust was to ensure that, should Meadowlark face financial difficulty, there would be sufficient assets available to pay off claimants, who would then not need to turn to Meadowlark itself for relief. Now that the trust apparently contains assets worth over $1,200,000 less than the minimum asset level of $1,500,000 that should have been allowable under the trust agreement, Meadowlark is exposed to more claims from claimants than would have been the case had the trust fund been fully funded. Plaintiff's claims, therefore, are designed at least in part to redress the injury suffered by Meadowlark when Defendant allowed the trust to be funded with nonconforming assets, and negligently failed to ascertain the true worth of the trust assets. Viewed in this light, the claims belong to Meadowlark itself, although other claimants may have an interest in the outcome of the claims. *See Long; Foster; cf. Sanders v. Citizens Nat'l Bank of Leesburg*, 585 So.2d 1064, 1065 (Fla.App. 1991) (settlor of *irrevocable* trust *who has retained no beneficial interest* in trust res has no right of action against trustee for breach of trust); John T. Gaubatz, *Grantor Enforcement of Trusts: Standing in One Private Law Setting*, 62 N.C.L.Rev. 905 (1984) (discussing situations under which settlor has been held to have standing to sue trustee for breach of trust).[2]

---

[2]The Court recognizes the incongruity of talking about claims as "belonging" to a defunct insurance company that became insolvent through the actions of its own officers and directors, where the claim is a result (at least in part) of the dereliction of those individuals. For this reason, the Court prefers the straightforward approach of those cases that say the intent of insurance-liquidation statutes is to allow liquidators or receivers to bring claims belonging to creditors or policyholders as a group, which claims will increase the total assets available for distribution to the group. The discussion of the breach-of-trust claim as belonging to Meadowlark, therefore, is intended only as an alternative resolution of the standing issue.

Defendant attempts to characterize the claims raised by Plaintiff as misrepresentation or fraud claims, and argues such claims are personal to the individual claimants. The court disagrees with this characterization. Plaintiff has expressly dismissed the fraud claims, and the issues remaining in this lawsuit are concerned only with the trust account itself rather than on any reliance that may have been placed on the existence of the trust account. Any recovery obtained in the case will simply replace funds that would otherwise have been in the trust account, and will not compensate any individual for damages suffered due to fraud or misrepresentation.

In addition to the general argument that a receiver or liquidator of an insurer has no standing to bring claims such as these, Defendant argues, in effect, that Plaintiff is the wrong receiver or liquidator. Defendant maintains that New Mexico's insurance-liquidation statute requires the New Mexico Superintendent of Insurance to bring suit in this case, because Meadowlark was domiciled in New Mexico. Defendant makes this argument even though, in the state-court proceedings, Defendant made no objection to the propriety of Plaintiff acting as receiver, and willingly turned over the trust assets to Plaintiff.

Defendant's argument is as follows: (1) Meadowlark was domiciled in New Mexico, because it was an alien insurer and New Mexico was the state in which the "larger amount" of Meadowlark assets were held in trust; (2) the New Mexico insurance-company-liquidation statute requires that the receiver for an insurance company domiciled in this state be the New Mexico superintendent of insurance. *See* NMSA 1978, §§ 59A-41-7, 59A-41-18. Phrased in the terms used in this area of the law, Defendant's position is that Plaintiff is an ancillary receiver for Meadowlark, because Meadowlark was not domiciled in Missouri; the New Mexico superintendent would be the domiciliary receiver, if he were to be appointed; and the domiciliary receiver, instead of the ancillary receiver, should be the one pursuing assets located in New Mexico, such as the cause of action against Defendant.

The Court finds that even if New Mexico should be considered the domiciliary state for Meadowlark,[3] the result sought by Defendant would be contrary to principles of full faith and credit and judicial economy, as well as the purposes behind the Uniform Insurers Liquidation Act, which has been adopted in New Mexico. NMSA 1978, §§ 59A-41-17 to -23. A Missouri court has appointed Plaintiff receiver for Meadowlark, and liquidation proceedings have been ongoing in Missouri for some time. New Mexico courts are required to give the Missouri court's orders full faith and credit, or at minimum to enforce them as a matter of comity. *See, e.g., Underwriters Nat'l Assurance Co. v. North Carolina Life and Accident and Health Ins. Guaranty Ass'n,* 455 U.S. 691 (1982); *Herstam v. Bd. of Directors of the Silvercreek Water and Sanitation Dist.*, 895 P.2d 1131, 1134 (Co.App. 1995) (injunction issued by one state in a receivership proceeding was entitled to full faith and credit); *Arroyo v. Chesapeake Ins. Co.*, 224 A.2d 101, 103 (Pa. Super. 1966) (full faith and credit requires recognition of title and authority of Maryland Insurance Commissioner by Pennsylvania court); *cf.* 1 Lee R. Russ and Thomas F. Segalla, *Couch on Insurance 3d*, § 5:37 (1997) ("As a general rule, a court's decree approving the rehabilitation plan for an insolvent insurer domiciled in its state has a res judicata effect upon out of state policy holders."). No reason for denying the Missouri order such treatment has been provided to the Court.

In addition, in the prior state proceedings, the New Mexico superintendent had an opportunity to assert his rights as domiciliary receiver. The superintendent was a party to those proceedings, and was given an opportunity to take control of the trust. Instead, when Plaintiff became a party to the case and requested that the trust be turned over to him, as Meadowlark's

---

[3]At this point, with the benefit of hindsight, it appears the trust established in New Mexico did contain most of the Meadowlark assets located in the United States, at the time the Missouri receivership proceedings were initiated. Under Section 59A-41-7, this would make New Mexico the domiciliary state for Meadowlark.

receiver, the superintendent did not object. Neither the superintendent nor Defendant argued that the superintendent, not Plaintiff, was the proper entity to control the trust under New Mexico law. Neither argued that the superintendent should be considered the domiciliary receiver, with superior rights to Meadowlark's New Mexico-based assets than the rights possessed by Plaintiff, an ancillary receiver. *See Credit Managers Ass'n v. Kennesaw Life & Accident Ins. Co.*, 809 F.2d 617, 622 (9th Cir. 1987) (insurance commissioner may acquiesce in another's appointment as receiver). In essence, the superintendent declined to assert its ability to be appointed domiciliary receiver, and Defendant failed to take any action to either object to Plaintiff's assertion of rights as a receiver, or to attempt to force the superintendent to assume such obligations.

The situation in this case, therefore, is as follows. There is an out-of-state, ancillary receiver and an ongoing receivership or liquidation proceeding. This receiver is ready, willing, and able to assert claims on behalf of Meadowlark's estate, claims that may ultimately benefit Meadowlark's policyholders, creditors, and other claimants. The supposedly "proper" receiver, the superintendent, has declined to exercise his rights under the insurers liquidation statute, and New Mexico's statute is silent as to what should occur if the superintendent does so. Defendant, which had a full and fair opportunity in a prior proceeding to litigate the issue of whether Plaintiff was authorized to assume control of New Mexico assets belonging to Meadowlark, failed to take that opportunity. Finally, if Defendant prevails on this issue a new receivership proceeding must commence, in New Mexico, in which the superintendent will have to request appointment as domiciliary receiver.

Given the foregoing, two things are apparent. First, it would be contrary to the purposes of the Uniform Insurers Liquidation Act ("UILA") to make it more difficult for the assets of Meadowlark to be collected and disbursed equitably to persons with valid claims. *See Murphy v. Ambassador Ins. Co.*, 478 A.2d 1243, 1247 (N.J.Super. 1984) (UILA was adopted to reduce

conflicts and difficulties created by the liquidation of multistate insurance companies; statute must be read with common sense). Since the New Mexico statute is silent as to what should occur if the only active receiver is an out-of-state, ancillary receiver, the statute is no bar to Plaintiff's standing in this case.[4] *See Garamendi v. Ryles,* 420 S.E.2d 633, 635 (Ga.App. 1992) (where UILA did not prohibit recognition of action of receiver appointed in non-reciprocal state, and recognition would serve purposes of UILA, assets of defunct insurer should be controlled by non-reciprocal trustee rather than local trustee). Second, the principle of judicial economy would be grievously violated if Plaintiff is not allowed to pursue this case. It makes little sense to decline, at this point in the proceedings, to allow Plaintiff to assert control over New Mexico assets, especially since Defendant failed to object to such control when it had an opportunity to do so, much earlier in the state proceedings.

Defendant makes one final argument against Plaintiff's standing in this case. Defendant raises the specter of potential double liability, if Plaintiff is allowed to bring this action and then individual beneficiaries of the trust are allowed to pursue their own claims. Defendant and Plaintiff have both acknowledged that the trust agreement prohibits individual beneficiaries from bringing such actions for breach of trust. Nevertheless, Defendant points out that there is nothing to stop the beneficiaries from bringing meritless lawsuits in violation of the trust agreement's terms. This argument is specious. The possibility that frivolous breach-of-trust actions will be brought in addition to Plaintiff's claims in this case is not a reason to deny standing to Plaintiff, the proper entity to bring this action.

### Motion for Summary Judgment -- Statute of Limitations

---

[4]The statute does not require that the superintendent initiate receivership proceedings, but simply says if a receiver is to be appointed in this state, the superintendent should be that receiver. § 59A-41-18(A).

Defendant argues the statute of limitations has run on Plaintiff's claims. Defendant and Plaintiff agree the six-year limitations period for actions based on a written contract applies to the breach-of-trust claims in this case. *See* NMSA 1978, § 37-1-3. Defendant maintains the breach of trust, if it occurred at all, happened when the trust was first established, and cites case law indicating an action for breach of contract accrues on the date of the breach. Plaintiff raises a number of arguments in opposition to the motion. However, the simplest answer is that an action for breach of trust accrues upon the date of injury resulting from that breach or at the time the beneficiary first knows of an injury resulting from the breach, not necessarily from the date of the breach itself. *See, e.g., Harris Trust Bank of Arizona v. Superior Court*, 933 P.2d 1227, 1231 (Ariz.App. 1996) (action for breach of trust accrues when beneficiary knew or should have known of breach); *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 564 (Ind. 1992) (action for breach of trust accrues and statute of limitations begins to run when beneficiary knew or could have discovered that an injury had been sustained as a result of the trustee's actions). In other words, no cause of action accrues and the limitations period cannot begin to run until, at minimum, the breach of trust has caused some injury. *See also Zamora v. Prematic Service Corp.*, 936 F.2d 1121, 1123 (10th Cir. 1991) (noting that in New Mexico, cause of action for breach of contract accrues at the time of injury resulting from the breach).

In this case, no injury occurred immediately upon the breach of trust. The injury, if any, caused by Defendant's alleged breach occurred only when qualified beneficiaries of the trust were unable to fully satisfy their claims against Meadowlark, because there were not sufficient assets in the trust to reach the minimum asset level of $1,500,000 that was supposed to be in the trust. In other words, if the breach-of-trust action brought by Plaintiff belongs to Meadowlark, Meadowlark did not suffer an injury until it was first unable to pay intended beneficiaries of the trust, it became clear the intended beneficiaries were owed sums exceeding the assets in the trust,

and it became clear the trust held assets worth less than $1,500,000. Similarly, if the breach-of-trust action is being brought on behalf of the beneficiaries, those beneficiaries did not suffer an injury until they were unable to satisfy their claims against Meadowlark, and they discovered the assets in the trust were worth less than $1,500,000. In either event, although the exact date upon which the cause of action accrued is unclear, it is undisputedly within the six-year limitations period the parties have agreed applies to this case.

### Motion for Partial Summary Adjudication – Breach of Trust Claim

Defendant has filed a motion directed at the merits of Plaintiff's breach-of-trust claim. As discussed below, Defendant makes a number of arguments attempting to demonstrate that Plaintiff's claim is without merit as a matter of law.

Defendant's first contention is that Plaintiff's remedies, if he represents the beneficiaries of the trust, are limited by the trust agreement. The trust agreement provides that no policyholder or third-party claimant shall have any cause of action against Defendant, except for a claim to the assets actually held in the trust. As discussed above, the parties agree this provision precludes a cause of action for breach of trust by any individual beneficiary of the trust. However, also as discussed above, Plaintiff does not represent only the beneficiaries in this action. He represents Meadowlark and Meadowlark's estate as well, and the trust agreement contains no similar limitation on the settlor's ability to bring a breach-of-trust claim against Defendant.

Defendant's next contention implicates what, to the Court, appears to be the crux of Plaintiff's case against Defendant – that is, what duty did Defendant owe to Meadowlark and the trust beneficiaries? Defendant maintains its only duty was to safeguard the assets that were actually placed in trust, whatever those assets might be.[5] Defendant explains that it did safeguard

---

[5]This discussion is concerned only with a breach-of-trust cause of action, as Plaintiff has dismissed any claim for fraud. It seems apparent that Defendant had a duty to third parties not to falsely or negligently state that the assets in the trust were worth at least $1,500,000, when they

the assets, by preventing Meadowlark's principals from gaining control over the assets[6] and by turning them over to Plaintiff undiminished in value. Plaintiff, on the other hand, claims Defendant had a duty to ensure that the terms of the trust agreement were complied with, and therefore to ensure that Meadowlark deposited a minimum of $1,500,000 in qualifying assets into the trust.

Ordinarily, a trustee's duties include not only safeguarding the assets that are actually deposited in the trust, but also using reasonable diligence to discover the location of the trust property and taking control of that property without unnecessary delay. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572 (1985); *Shepard v. K.B. Fruit & Vegetable, Inc.*, 868 F.Supp. 703, 706 (E.D.Pa. 1994); Restatement (Second) of Trusts, § 175. In this case, it appears the trust property was intended to be $1,500,000 in cash, registered securities, or letters of credit, and under the general rule Defendant may have had a duty to attempt to locate such assets (assuming they existed) and take control of them.

It is not clear, however, whether the general rule applies to the trust established by Meadowlark. The trust agreement provides, in part, "Trustee shall be under no duty or obligation to require the Company to make any transfers or payments of *additional* assets to the Trust and it shall be conclusively presumed that any and all such transfers or payments to the Trustee have been properly made" (emphasis added). The meaning of this provision is not clear. It is possible, as Defendant argues, that this provision negates the usual duty of a trustee to take control of the assets of a trust; in other words, Defendant's only duty was to accept the assets it was actually

---

were actually worth far less. Such a misrepresentation claim, however, is no longer part of this action.

[6]As noted above, the prior state-court proceedings occurred when Defendant went to court to prevent Meadowlark's principals from looting the trust.

given and keep those assets safe, and Defendant had no duty to ensure that Meadowlark deposited sufficient assets of sufficient quality. It is also possible, however, as Plaintiff argues, that the use of the word "additional" in the provision means the phrase refers to assets other than those that were to be originally deposited. Plaintiff posits that this provision refers to a situation in which securities have been deposited in the trust, and the securities decline in value. According to Plaintiff, this provision only eliminates any duty Defendant might have had to try to force Meadowlark to deposit additional assets to make up for the decline in value, but has no effect on the duty to ensure that the original deposit of assets was proper.

The Court finds this provision is ambiguous and not susceptible to interpretation at the summary-judgment stage of the proceedings. Additional evidence concerning the intent of the parties and the purpose of the provision will be necessary before the issue of Defendant's duty can be resolved. *See, e.g., Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993) (discussing use of extrinsic evidence in interpreting contractual provision, even seemingly unambiguous one). Summary judgment on this issue, therefore, is inappropriate.

Defendant also maintains it is entitled to summary judgment because, as a matter of law, Plaintiff cannot prove any damages resulting from the breach of trust. Defendant contends that, even if it had a duty to attempt to force Meadowlark to deposit appropriate assets in an appropriate amount, its efforts to do so would have been futile, as Meadowlark had no other assets to deposit. If Meadowlark did not have such assets, no beneficiary was damaged by Defendant's failure to take steps to ensure the trust was properly funded, because any steps that were taken could not have added any additional assets to the trust. As proof that Meadowlark had no other assets to convey to the trust, Defendant points to Meadowlark's current insolvency. However, the mere fact that Meadowlark became insolvent, due to the criminal actions of its principals, does not conclusively establish that at the time the trust was created Meadowlark had

no assets other than those transferred to the trust.  Meadowlark may have had other assets at the time, and the assets may have been subsequently stolen, embezzled, or otherwise taken from Meadowlark by its principals.  Since neither party has presented any evidence concerning Meadowlark's potential assets at the time the trust agreement was signed, this issue raises a fact question that must be resolved at trial, rather than at the summary-judgment stage.

Defendant also argues the trust agreement did not in fact create a trust, but was only an agreement to create a trust in the future.  In essence, Defendant's argument is that a trust cannot exist as to certain assets until the trust assets are actually physically transferred to the trustee. From this, Defendant states the proposition it could not be liable for anything other than mismanagement of the assets it actually had in its possession.  The Court disagrees.  Initially, it must be noted there is legal authority to support the proposition that a trustee may be liable for failing to investigate the market value of assets tendered to a trust.  *Whitfield v. Lindemann*, 853 F.2d 1298, 1303 (5th Cir. 1988); *Behrman v. Egan*, 95 A.2d 599, 602 (N.J.Super. 1953); *Dickerson v. Camden Trust Co.*, 53 A.2d 225, 239 (N.J.Ch. 1947).  Thus, Defendant could be held liable not just for mismanagement of the assets actually placed in trust, but also for failing to investigate the true value of those assets.

Moreover, while it is true that a trust cannot exist as to non-existent assets, or assets the settlor plans to acquire in the future,  *see* Restatement (Second) of Trusts, §§ 66, 74, 75, if the asset does exist, a trustee has a duty to reduce the asset to the trustee's possession, and can be held liable for losses resulting from a failure to obtain such possession.  *See In re Reinboth,* 157 F. 672, 674 (2d Cir. 1907) (trustee may be charged with the value of assets that never came into the trustee's possession if trustee failed in the duty to get the assets into his possession); *In re: Marine Midland Bank*, 512 N.Y.S.2d 942, 943 (1987) (once trustee accepts its designation, responsibilities in respect to the trust spring into being, including duty to reduce the trust res to its

possession; trustee may be charged with value of assets that never came into its possession if it failed in its duty to acquire them).  The central question with respect to this argument, therefore, is the same as for the damages issue – did Meadowlark have additional cash, securities, or letters of credit that could have been contributed to the trust, had Defendant actively sought to acquire such assets from Meadowlark?[7]  As noted above, this is a fact question not amenable to resolution at this time.

Defendant also maintains there was no valid, enforceable trust because the purpose of the trust failed.  Defendant states the purpose of the trust was to allow Meadowlark to qualify as an eligible or approved surplus lines insurer, and that Meadowlark was never so approved by the New Mexico insurance regulators.  Therefore, reasons Defendant, the purpose of the trust failed and the trust and all duties related to the trust became unenforceable.  This argument overlooks one simple fact:  there were two purposes for the trust.  According to the express terms of the trust agreement, one purpose of the trust was to allow Meadowlark to qualify to sell surplus lines insurance.  Another purpose, however, was to provide security for any policyholders Meadowlark may have anywhere in the United States.  It is undisputed that Meadowlark did sell a number of insurance policies in this country.  Therefore, the second purpose of the trust was satisfied, in that the trust provided some measure of security for those individuals or businesses that purchased insurance policies from Meadowlark.  This purpose obviously became the more important of the two purposes recited in the trust agreement, especially since Meadowlark proceeded to sell insurance policies despite the lack of any authorization to do so from any state regulatory body. To hold now that the trust was dissolved simply because Meadowlark was never approved as a

---

[7]This statement of the issue ignores the possibility, discussed above, that the trust agreement negates any duty Defendant might have had to try to force Meadowlark to contribute the correct assets in the correct amount.  If it is ultimately determined Defendant had no such duty, of course, the discussion of this issue will be moot.

surplus lines insurer would be to deprive policyholders and other claimants of the protection to which they were entitled. In sum, the Court's holding is as follows: (1) Meadowlark was required by state regulators to establish a trust for the protection of policyholders; (2) Meadowlark did establish such a trust; (3) Meadowlark sold insurance policies and the policyholders became beneficiaries of the trust; and (4) the trust cannot be held to be terminated because Meadowlark's sales happened to be without lawful authority.

Defendant's final argument with respect to the breach-of-trust claim is that it did not breach the trust agreement, as amended. As noted above, shortly after the execution of the trust agreement, the parties attempted to amend the agreement. This purported amendment would have eliminated the requirement that the trust assets consist only of cash, registered securities, or letters of credit, and therefore would have approved the assets actually deposited in the trust. It would also have eliminated Defendant's obligation to evaluate the assets deposited in trust, to ensure they met the minimum value required by the trust agreement. Finally, the purported amendment would have retroactively eliminated the requirement, contained in the original agreement, that any amendments to the agreement must be approved by the National Association of Insurance Commissioners ("NAIC"). The problem with the amendment, as Defendant recognizes, is that the parties did not obtain approval from the NAIC for the amendment. By the express terms of the trust agreement, therefore, the amendment was invalid. Defendant attempts to avoid this result by arguing, first, that the amendment eliminated the NAIC-approval requirement. This argument makes no sense. An amendment that is in violation of an agreement, because the amendment did not meet an express condition of the original agreement, cannot possibly eliminate that express condition. In other words, the parties cannot say "The only way to change our agreement is by obtaining third party approval," and then eliminate the required approval without consulting the third party.

Defendant also argues the NAIC had no standing to approve or reject an amendment to the trust agreement, because Meadowlark was not an NAIC-listed company. Even if NAIC had no regulatory authority over Meadowlark, however, there is no reason the parties could not choose NAIC as an impartial third party, whose approval of an amendment would be a condition to the validity of the amendment. Defendant has cited no authority indicating that two parties to a contract cannot condition changes to the contract upon submission of the changes to an impartial third party. Therefore, the Court has searched for no such authority. Under basic contracts law, parties can agree to certain express conditions that must occur before duties under the contract will be altered. In this case, the parties expressly agreed the trust agreement would not be altered unless the changes were first submitted to the NAIC for approval. The Court has been provided no good reason to invalidate the parties' agreement on this point. The agreement will therefore be upheld and the purported amendment held ineffective.

**Motion for Partial Summary Adjudication – Punitive Damages**

Defendant maintains there is insufficient evidence to allow the punitive damages claim to go to trial. As a purely factual matter, the Court disagrees. In New Mexico, punitive damages are recoverable, in contract cases, if the defendant acted recklessly, wantonly, oppressively, or fraudulently. NMRA 13-861 (uniform jury instruction). Plaintiff has presented evidence that Defendant accepted non-conforming assets into the trust, made no effort to obtain qualifying assets, attempted to execute an amendment to the trust agreement in an effort to avoid possible liability for its failings, and acted the way it did in order to curry favor with the New Mexico superintendent of insurance. If a jury believed all of Plaintiff's evidence, the jury could rationally determine Defendant acted recklessly.

It is not clear to the Court, however, that punitive damages are recoverable at all, as a matter of law, in breach-of-trust cases. There is authority for the proposition that such damages

are not recoverable. *See, e.g., Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 626-27 (7th Cir. 1987) (stating that punitive damages are generally not recoverable from a trustee under the law of trusts, for breach of fiduciary duty). Neither party briefed this line of authority, however, and the Court therefore declines to rule on the question at this time.

### Motion for Partial Summary Adjudication – Attorney's Fees

Defendant notes, correctly, that New Mexico follows the American rule with respect to attorney's fees – in the absence of statutory authority to the contrary, parties pay their own attorney's fees. *See Montoya v. Villa Linda Mall, Ltd.*, 793 P.2d 258, 259 (N.M. 1990). In response, Plaintiff makes two arguments: first, that Defendant's positions in this matter have been frivolous and attorney's fees may be awarded under Rule 11; second, that in trust cases, attorney's fees may be awarded as a matter of equity. The Court is not prepared to rule out either of these possibilities as a matter of law, at this time. The imposition of Rule 11 sanctions is a heavily fact-based inquiry, and even if such sanctions may not appear appropriate at this time (an issue as to which the Court expresses no opinion), litigation of this case is not yet complete. Whether Rule 11 sanctions are to be granted or denied, the Court will not decide the issue prior to the conclusion of the case.

As to the breach-of-trust fees issue, Plaintiff points out there is authority for the allowance of attorney's fees in such cases, payable by the trustee, as a matter of equity. *See, e.g.,* George G. Bogert and George T. Bogert, *The Law of Trusts and Trustees*, § 871 (2d Ed. 1995); *Allard v. Pacific Nat'l Bank*, 663 P.2d 104, 112 (Wash. 1983). In addition, New Mexico has shown a predilection for following Washington law on the issue of attorney's fees and exceptions to the American rule. *See Bassett v. Bassett*, 798 P.2d 160, 165 (N.M. 1990). As the *Allard* case establishes, Washington allows an award of attorney's fees against a trustee, under certain

circumstances. Therefore, the Court will not at this time rule out the possibility of ordering Defendant, on equitable grounds, to pay part or all of Plaintiff's attorney's fees.

**Motion for Partial Summary Adjudication – Gross Negligence Claim**

Defendant moves to dismiss Plaintiff's claim for gross negligence, maintaining there is no such cause of action in New Mexico. As Plaintiff points out in response, however, this claim is not really a claim for "gross negligence." Instead, it is a claim for breach of fiduciary duty, or breach of trust. The claim is phrased in gross-negligence terms because the trust agreement limits Defendant's liability to instances in which Defendant has acted in a grossly negligent manner, or has committed willful wrongful acts. In other words, unless Defendant acted willfully or with gross negligence, no breach of trust or of fiduciary duty would have occurred. This count of the complaint, therefore, simply states a second claim for breach of fiduciary duty or breach of trust.

Defendant argues Plaintiff is now attempting to amend his complaint, by pointing out that Count II is a breach-of-fiduciary-duty claim rather than a negligence claim. The Court disagrees. Defendant was aware that the trust agreement required gross negligence as a basis for liability. Whether the claim is considered a "gross negligence" claim standing alone, or a "gross negligence as the basis for breach of trust" claim, it is clear Plaintiff was complaining about the manner in which Defendant administered the trust. It is also clear a breach-of-trust or breach-of-fiduciary-duty claim is recognized in New Mexico. Merely clarifying the nature of the claim does not amount to an amendment of the complaint.

Defendant also argues that Count II is a misrepresentation claim, and that no misrepresentation evidence has been presented, and that Count II should therefore be dismissed. Again, the Court disagrees. Plaintiff has dismissed the fraud claim, and it appears Plaintiff is not attempting to raise any cause of action involving misrepresentation. Instead, Plaintiff is pursuing only causes of action belonging to Meadowlark or to trust beneficiaries as a group, rather than as

individuals. These causes of action are in the nature of breach-of-trust claims, not claims involving misrepresentation of any particular policyholder or other individual.

**Plaintiff's Motion for Summary Judgment**

Plaintiff's motion for summary judgment has two parts. First, Plaintiff maintains a breach of trust has been established as a matter of undisputed fact. Second, Plaintiff contends the damages resulting from this breach of trust are also undisputed, and amount to the difference between $1,500,000 (the amount that should have been initially placed in trust) and $206,000 (the amount Plaintiff claims the assets in trust were actually worth). The Court disagrees that either of these propositions has been established as a matter of undisputed fact or law.

With respect to the breach-of-trust issue, the Court has already discussed above the issue concerning the extent of Defendant's duties. That is, it is unclear at this time whether Defendant had an initial duty to attempt to force Meadowlark to deposit the minimum amount of $1,500,000, in cash or securities or letters of credit, into the trust. It is possible Defendant's only duty was, as Defendant argues, to safeguard whatever assets were actually deposited into the trust.[8] If that was the case, Defendant's failure to take any steps to obtain more cash, securities, or letters of credit would not be considered a breach of trust.

Another possible duty Defendant may have had, under the trust agreement, was to properly evaluate the value of the assets that were actually deposited into the trust. Plaintiff argues the value of those assets was clearly inflated. However, the issue of whether Defendant knew or should have known the real estate assets were overvalued is an issue of fact not subject to resolution at the summary-judgment stage. Defendant has presented evidence that it relied on

---

[8]Defendant clearly had a duty not to mislead anyone that might rely on Defendant's statements as to the contents of the trust. However, such a misrepresentation claim is no longer involved in this case, as discussed above. The only duties discussed in this part of the opinion, therefore, are duties with respect to the trust itself.

documents provided by Meadowlark to arrive at its valuation of the assets. This alone raises an issue of fact concerning the reasonableness of such reliance under the circumstances of this case. Furthermore, there is the issue of what duties Defendant had toward the trust even if it knew the assets were overvalued. As discussed above, Defendant may have had no duty to attempt to acquire more assets from Meadowlark for the trust, even if it knew or should have known the trust was underfunded. If that was the case, again, it would seem to negate any breach-of-trust liability based on the lack of sufficient assets in the trust.

The damages issue is similarly unclear at this time. Assuming Defendant had a duty to attempt to collect $1,500,000 from Meadowlark at the inception of the trust, that duty did not automatically translate to a duty to make up the difference should Meadowlark fail to deposit the correct amount into the trust. If Defendant breached its duties toward the trust, Defendant would be liable for the actual damages caused by that breach, but would not be liable for damages that would have occurred even in the absence of the breach. *See, e.g., Whitfield, supra*, 853 F.2d at 1304 (trustee is not liable for loss if the loss would have occurred even in the absence of the breach of trust); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (remedy for breach of trust is to restore beneficiaries to position they would have been in had no breach occurred); Restatement (Second) Torts, § 205; Bogert, § 583, p. 355.

What this means in this case is the following: Defendant is liable only for the amount of additional assets that could have been placed in the trust, if Defendant had attempted to force Meadowlark to deposit the correct amount of assets, in the correct form, into the trust. In other words, if Meadowlark possessed no other assets, at the time the trust was created, to deposit into the trust, Defendant's breach caused the trust no harm. If Meadowlark had some other assets, but not enough to make up the full $1.5 million, Defendant's breach harmed the trust only to the extent of the value of the other assets owned by Meadowlark that could have been contributed to

the trust but were not.  This question is a fact issue as to which little or no evidence has been presented to the Court; as noted above, Defendant's only argument has been that Meadowlark *subsequently* became insolvent.   Plaintiff has presented no evidence on the issue at all, preferring instead to rely on the assertion that Defendant is somehow automatically liable for making up the difference between the assets actually deposited into the trust, and the assets the trust was supposed to contain.  Plaintiff has cited no authority for this proposition, and as noted above it is not in accord with the rule that a trustee is liable only for damages actually caused by the trustee's breach.  Summary judgment will therefore be denied on the damages issue as well.

**Conclusion**

As discussed above, the core issues in this case are the nature of Defendant's duties with respect to proper funding of the trust, and the extent of the damages that may have been caused by Defendant's possible breach of its duties as trustee.  Significant factual and legal questions remain with respect to both issues.  In addition, for the reasons discussed above, it is inappropriate to grant summary judgment, in part or whole, on any of the other issues raised by Defendant.  For these reasons, all of the parties' motions will be denied.

## ORDER

Defendant's motions for partial or total summary judgment (Docs. 25, 32, 39, 70, 75, and 79) are hereby DENIED; and Plaintiff's motion for summary judgment (Doc. 44) is hereby DENIED.

DATED November 17, 1999.

_____
BRUCE D. BLACK

UNITED STATES DISTRICT JUDGE

**Attorneys:**

**For Plaintiffs**
Robert L. Brace
Hollister & Brace
P.O. Box 630
Santa Barbara, CA 93101

William C. Herring
1815 Gabaldon Drive, N.W.
Albuquerque, NM 87104

**For Defendant**
Michael W. Brennan
Gregory D. Steinman
Madison, Harbour, Mroz & Brennan, P.C.
P.O. Box 25467
Albuquerque, NM 87125